Case 24-1593, Mike Yoder et al versus Scott Bowen. Oral argument, 15 minutes per side. Mr. Quigno for the appellants. Good morning, your honors. Andrew Quigno for the appellants, Mike Yoder, Drone Deer Recovery and Jeremy Funk. I've requested three minutes for rebuttal. May it please the court, this appeal concerns the appeal of a motion to dismiss that was granted in the lower court as to a challenge, a First Amendment challenge to a statute in the state of Michigan that bans a speech input and burdens the speech content, the content of the speech that that input creates and provides. When hunters like Jeremy Funk go on a hunt, afterwards they are required to locate and collect the animal that they have killed. In order to do that, Mr. Funk needs information, information of the location of that animal that he shot. That information can be provided by someone like Mike Yoder and his company Drone Deer Recovery. What Mr. Yoder does is provide location services, location drone technology or unmanned aerial vehicles. Using his unmanned aerial vehicles, he can find and locate the information needed to find the downed animal that Mr. Funk has shot using long zoom lenses, infrared technology, thermal imaging. His drones are connected to GPS satellites, which will then send a location pin to Mr. Funk that he can use in a map service like Google Maps to find and locate the animal and then go and collect it. That exchange between Mr. Funk and Mr. Yoder is speech. They are collecting information, obtaining information and transmitting that information that Mr. Funk receives. Let me go back for just a second. I'm struggling with standing here, subject matter jurisdiction. I don't think we can reach the merits until we're comfortable there. My real issue is whether there is a credible threat of enforcement here. When we look at the McKay factors, can you explain to me? I think it's clear that there's subjective fear that's been alleged in the complaint, but can you explain to me how the McKay factors apply here? There is a credible threat of enforcement of the drone statute against Mr. Yoder and Mr. Funk. In the complaint, the appellants have alleged, and this is at paragraphs 32 and 33, that in response to an inquiry from drone operators about using drones to locate downed game, DNR officials indicated that using drones to locate an animal or to take an animal in any manner would fall under that statute and would be prohibited. The appellants here don't have to expose themselves to prosecution by violating the statute first in order to make a claim for prospective relief or injunctive relief in this case. There's been a credible threat that this would be enforced against him. In addition to that, your honors... I would take that as an enforcement warning letter, though the paragraphs that you're referring to, but under the McKay factors, it says it has to be sent to the plaintiffs regarding their specific conduct, and there's nothing in the complaint to suggest that the individuals that are mentioned in 32 and 33, Schultz and Cassell, are the plaintiffs. So that's the way I look at it, and that's what I'm struggling with. I understand that this letter was sent to those two individuals, but if it wasn't the plaintiffs, then I don't see how that counts as a warning letter sent to the plaintiffs. So in order to have standing here and to make a claim for prospective relief, a pre-enforcement claim, the threat does not have to be specific and personal to the individuals that are seeking relief. The credible threat here was in fact, I'm not certain if it was made clear in the complaint, but these drone operators were affiliated with or working with Mr. Yoder. But nonetheless, the threat of enforcement does not have to be specific or personal to Mr. Yoder and Mr. Funk. The threat is credible enough without having it to be directed towards them, and as a result, they have standing. They have restrained themselves from operating in Michigan. Mr. Funk has refrained from seeking out these services when he goes on a hunt. That is enough to have chilled their First Amendment rights of collecting and obtaining information. So the appellants here do have standing because of that threat. And what the lower court ultimately focused on is... Just go through the history of past enforcement against the plaintiffs or others. What's there in the complaint or otherwise to support that particular McKay fact? The complaint doesn't go into a history of past enforcement. I think the prospective enforcement, however, is sufficient under McKay in order to allow... Just go through the factors. Enforcement warning letters sent to the plaintiffs regarding their specific conduct. What's your position on that? So I would go back to the email that's referenced in paragraphs 32 and 33, Your Honor. And again, even though it is not specific to the plaintiffs, they are well aware of the threat of enforcement. In addition to that, the Michigan Summary of Hunting Guidelines issued in 2023 made it clear that the type of conduct that Mr. Yoder was engaged in would be prohibited by that statute. So that gives... I'm going to the next... Certainly. Attribute of the statute that makes it easier to enforce. Is there any support for that? I'm sorry, say that again, Your Honor. An attribute of the challenge statute that makes it enforcement easier or more likely. That makes the enforcement of the statute more likely? Yes. Usually what you have is, you know, a citizen can enforce the statute that makes it easier to enforce. So is there anything to support that particular McKay factor in the complaint or in the record? I think if you look at the way that the drones operate, the nature of how they locate information, it would be easy for a DNR official to enforce that statute. Because these drones fly 400 feet in the air, they're not what you would normally see in hunting grounds a DNR official could easily see what was going on there and approach the person that was using that and enforce the statute. Of course, going back again to whether this is speech, and not to depart from the McKay factors, but just revisiting the fact that this is speech, a DNR official would inquire about the content of the information that that drone was was seeking. And so it would be something that would easily be enforced. Finally, the disavowal whether enforcement has been disavowed by DNR. Yes, Your Honor. There has been no disavowal here, Your Honor. The enforcement of the statute has been made very clear to the appellants. And I know the friends on our friends on the other side have mentioned that the the conduct generally could would would not be cited as to the collection of information. But DNR hasn't said that collecting information, location information, specifically using a drone would be permitted. That's precisely what is being prohibited and what could be enforced against the appellants here. And it is that lack of specific disavowal, which again goes back to making this threat of enforcement against the appellants credible. There has been no disavowal. The fact that the DNR officials are not carving out an exception when they responded to the inquiry of those drone operators that are referenced in the complaint, they never mentioned an exception to their specific conduct of locating information, gathering information to find deer. It was the use of a drone in any manner to take game is prohibited and that would include the use of the individuals here, Mr. Yoder and Mr. Funk. Your clients, at least the drone operators, as I understand it, their point is we want to use the drones, create this information to send it to the hunters so that the hunters can find out where the deer are. Is that accurate? Yes, Your Honor. So I mean if I'm looking at 3233, those individuals are just saying hey we want to locate. It doesn't talk about sort of sending the information to hunters so that the hunters can find it. They say we just want to use the drones to locate the information. Yes, and with Mr. Yoder's business, how he specifically operates his business is he does send that information to clients like Mr. Funk. So this is an as-applied challenge. Now whether or not the other drone operators would be able to use the drones for other purposes on hunting grounds, Mr. Yoder specifically wants to send that information to Mr. Funk. Mr. Funk would like to receive that information. So it's that transaction again, Your Honor, the exchange of information, the gathering of information, and the receipt of it, which is the speech at issue and the speech being prohibited. What the lower court unfortunately did was it disaggregated that entire process. It went upstream to the source of the information and said because it's involving a drone, drones aren't speech, therefore this statute doesn't prohibit speech. But as we had referred to in the case, drones are flying aerial recording devices that that have aerial capability. They record information and the statute goes a step further by saying not only are you prohibited from using a drone, but you are prohibited from using it for that purpose. And it is... If the hunter were to receive the information generated by the drone but not use that information to collect the deer, I assume you would agree that the statute does not violate it? I think the DNR would say the statute is violated. So the statute specifically says that an individual shall not use an unmanned aerial vehicle to take game. And take is defined to include pursue, collect, locate, or an attempt to do so. DNR would most likely say that the transmission of the information for the purpose of collecting the deer, even if you didn't actually collect it, it is that attempt that would make Mr. Yoder and Mr. Funk fall under the ambit of that statute, even if Mr. Funk didn't actually go out and collect the game. How do we know that that would be DNR's position? Is that you're just surmising that or is there some statement they've given on that? Yeah, the DNR has indicated that they would apply the statute, as referenced again in the complaint, to the activity of using a drone to locate deer. Again, Michigan Hunting Summary Guidelines that were issued in 2023 say the same thing, that the use of a drone in any manner to take an animal would be prohibited, and locating either live or dead animals would fall under that as well. As I understood the hypothetical, it wasn't used to take an animal in any way, right? Yes, and what I think makes the statute operational, even in a situation where you did not take the animal, is the attempt to do so. That's in the definition of take. If we were to consider it an attempt as a substantial step towards effectuating whatever it is that we were doing. I'm sorry to interrupt, but I think your time is expiring. My concern really is that the statute regulates conduct and not speech, and that's why I'm asking those questions. So maybe you could address... Yes, Your Honor. To focus on the drone use as conduct, and my time is expired, but I will answer your question, Your Honor. That again goes to the improper disaggregation of speech, that oftentimes the government will, and as it does here, regulate the means of speech creation in order to regulate the speech itself. Regulation often happens at different points of the speech process, and that is precisely what is happening here. Not to mention the fact that the statute also prohibits the content of the speech that that input creates. If Mr. Yoder were to use the drone simply to take pictures of the landscape or to grab postcards to sell to tourists, he would not be in violation of the statute. But by using the drone to specifically gather information for the purpose of taking game, he is in violation of that statute. The statute distinguishes between the purposes of using a drone, shows that it is not about conduct, it is about speech because it is regulating content, and purpose of that speech is content. So if, let's say, a conservationist attempted to locate a wounded deer, your view would be the drone statute is not violated? That's correct, Your Honor, because the purpose of a conservationist would not be, under the definition, to take that game. Thank you, Your Honor. Good morning, Your Honors. Nathan Gamble on behalf of the Director of the Michigan Department of Natural Resources. May it please the court. Michigan's law prohibits the use of drones to take animals, and the reason that the legislature updated the law was simply to make it consistent with an existing prohibition on using airplanes to take animals. So it's against the law in Michigan to fly over an area with binoculars out of an airplane looking for deer so that you can try and take them and hunt them. That's part of the take process. The legislature updated the law to account for the fact that now people can do the same thing with drones. They put their goggles on and put a drone up in the sky and they put their eyes up in the sky scanning the landscape for deer. That is conduct. So at what point in the tracking process would, let's say, DDR services violate the drone statute? So you've got the tracking, you've got collection of the deer's location, receipt of the information, and then maybe at some point actually collecting the deer. At what point is the statute violated? At the beginning. Once DDR puts their eyes in the sky looking for deer, so let's say their client calls them and says, hey I think I shot a deer, I don't really know, can you come help me try and find it? Once they show up, put their eyes in the sky, and start looking for that deer that the hunter thinks they have shot, the statute has been violated right at that point. So what if it's a photographer or conservationist who's just tracking the deer for one purpose or another, other than to collect the deer? Are they violating the statute from the very beginning? If they are doing it in a way that meets the definition of take, and take is defined very broadly, which includes basically any action to look for a deer to try and collect the deer, to track the deer, to follow it, to harass it, to pursue it. The facts that are alleged here in the complaint that we assume are true are that the plaintiffs are trying to take the deer. Assuming those facts are true, then the moment they put their eye in the sky and start to look for a deer, they have violated the statute. Contrast that with the law in Wisconsin. In Wisconsin, they didn't start to violate the law until they used the drone to start taking pictures. That is an important distinction, because Michigan does not prohibit taking pictures, doesn't prohibit collecting information. The allegations in the plaintiff's complaint draw this distinction, and even in fellow counsel's introduction... I'm getting a little confused. You say it doesn't prohibit taking pictures from the drones? No, it does not. So you're saying it's the purpose that controls? It's the act of enhancing your senses. So the same way, Your Honor, where if you were flying in an airplane above the area with binoculars, that's an unfair advantage over these deer. The same thing, that's against the law in Michigan for the same reason, that putting a drone in the sky and projecting the images in a live stream so that you can find deer, that's an unfair advantage. That's just conduct, and under the plaintiff's allegations that we assume are true, they don't always create speech. First, they have to locate a deer, and then they have to look at it for a while. So imagine an airplane flying over looking at a deer through binoculars. That's still just conduct. The speech the plaintiff says is protected is once they decide, yes, this deer is dead or about to die, then we create a location pin, then we send it to our client. That's speech, they say. Well, that's not against the law. People can obtain that information however they like. We're not trying to prevent people from finding deer. So when the plaintiffs refer to this as an input to speech, that's not quite right, because the comparison they bring up is this idea of prohibiting ink so that people can't publish political pamphlets. What about the notion that it's sort of expressive conduct, but it's expressive conduct, so the speech and the conduct are sort of intertwined? Well, there is an analysis for determining whether conduct is actually expressive conduct, and we lay it out in the briefing, Your Honor. The plaintiff's allegations do not satisfy that analysis at all. It's not like they're, I don't know, burning a flag or something to where it's conduct, but it's sending a message that everyone seeing it understands, and they don't satisfy that at all, Your Honor. The message that they're saying, the hunter's going to understand the message, right? Well, the statute has violated, Your Honor, without any hunter learning anything about this deer. So that's the point that we try to make, is that a drone pilot violates the statute without communicating anything to anyone. If they go out there alone, say nothing to anyone, communicate nothing to anyone, take no pictures of anything, and they give themselves the advantage of putting their eyes in the sky and looking for this deer, that statute has been violated. And so that's the difference between Michigan's law and the other laws that we discuss in the briefing. And you're, as I said, this is very confusing. If they go up there, they violated the law, even if there's no taking, even if the purpose isn't to take? The definition of take is a technical legal term. It doesn't just mean killing a deer. It also means looking for a deer. And so, yes, they have taken, they have used a drone. So if you go, if you're a nature lover, you send your drone up to look at wildlife with no intention of doing anything to hurt them in any way, you're violating the statute? Really, the situation we're dealing with are the facts as alleged in the complaint, Your Honor. And the plaintiffs are saying the reason they're doing this is to take a deer. I know, but you're making assertions about violating the statute at this point or that point. And I'm just questioning what you said so that I understand the case. Have you violated the statute simply by sending drones up to look at deer? You very well may have, Your Honor. Without any purpose to harm them at all? It could be, yes, Your Honor, the way the statute is written. But the plaintiffs don't allege that. That's not what they allege. I know that. We're operating in the assuming what they're alleging is true. And they're saying this is part of our hunting operation. So it's obviously true under the statute that once they put this drone in the sky and start looking at deer, they don't have to say anything to anyone. There's no speech created at all. And they violated the statute. So the Texas case is a good example where there were actually two drone laws that the Fifth Circuit examined. The first drone law just forbade the operation of a drone. You couldn't fly a drone over prisons, for example, or sports stadiums. Didn't say anything about recording information. The second law forbade the use of a drone to capture images. That was the language in the statute. And the Fifth Circuit said, well, the first drone law, that doesn't implicate the free speech clause. It's not prohibiting speech. And simply putting your eyes in the sky and flying a drone around, that's not expressive conduct. So the free speech clause is not even implicated. That's Michigan's law. If Michigan's law was similar to the one in Wisconsin, it doesn't just forbid people from using drones to take deer. It says you are forbidden from, quote, photographing, videotaping, audiotaping, or recording deer as part of a hunt. Well, yes, that law implicates the free speech clause in Wisconsin. That's not the case here. The plaintiffs have not identified a single case in which a court has found that a law prohibiting the operation of a drone implicates the free speech clause. The only cases that have squarely addressed that scenario have ruled that it does not. Putting a drone, your eyes in the sky, is not expressive conduct. The plaintiffs repeatedly referred to the law in Wyoming, which is the Western Watersheds case. That law explicitly forbade writing notes and photographing wildlife. That's what the law said. So understandably, the court ruled that that implicated the free speech clause. Not so in Michigan. There is nothing, and the plaintiffs conceded this below, and the district court recognized that they conceded it on page ID 132, where they recognize the drone statute does not forbid our collection or dissemination of information, period. That's a quote from their brief, and the district court said, well, you've conceded that we're not talking about a law that actually regulates speech. It regulates conduct. And that's why the free speech clause is not implicated. I thought that the district court's treatment of the, I think it's Lichtenstein case, is effective as well. The plaintiffs continue to assist that, well, even though this law doesn't regulate speech directly, it regulates an input on speech. Well, there are other ways to get this information, the district court held. You can do it the same way hunters have been doing it for hundreds of years before drones became popular a few years ago, which is you can hire someone to go find the deer for you. You can hire people to use dogs to track down these deer. They can create and disseminate location information in those many other ways. But let's say we take the position that it is expressive conduct. Assuming that's the case, does this statute run afoul, as applied to the first amendment? No. No, it does not, Your Honor. This court just held, I think it was 2023, that expressive conduct only needs to satisfy the intermediate scrutiny test. And we have laid out in our brief in detail why, if the court does decide that this is expressive conduct and disagree with the Fifth Circuit on that, then Michigan's law satisfies intermediate scrutiny, because it's a reasonable, it's a core government interest. Managing the state's wildlife is an incredibly important component of the government's purpose. The Constitution tasks the government with ensuring that wildlife is conserved. There are tons of laws are used to implement. It's a very large industry, so it's an important government interest. It's a reasonable thing to do, to prevent people from getting an unfair advantage. The same way you can't fly an airplane with binoculars over, you can't put your eyes in the sky with the drone. It's the same thing. It's a reasonable thing to do. And it would be less efficient to try and do it a different way. It's a straightforward ban. You cannot use drones to take deer, period. If the law were written differently, if it regulated different things, it might violate, or excuse me, it might implicate the free speech clause. But it just isn't. This is similar to the laws that regulate conduct. Just because it's less convenient for the plaintiffs to obtain the information they want to sell to their clients doesn't mean that it implicates the First Amendment. That's what the U.S. Supreme Court held in the Ismael case. It's limited to its facts. It's only about travel bans to foreign countries. That is absolutely not the case. That is widely accepted, that just because it's less convenient for a journalist, for example, to get information doesn't mean that the government can't lock its buildings. That's a prohibition on conduct. Unless the Court has any additional questions, I'm ready to go. Thank you, Your Honor. Thank you, Your Honor. I just want to reiterate this as-applied challenge and what specifically Mr. Yoder does that is being prohibited. His specific service deals with locating dead animals, downed animals. It is not to look for live animals. He is not hired by Mr. Funk to look for a live animal in order to shoot. It is only after that has taken place that Mr. Yoder engages in the collection of location information. And the reason that's important is I think it will illuminate further the distinction that was being made up here and the questions that were being raised as to what would be acceptable and what wouldn't be. So if Mr. Yoder were to fly up a mountain and step up his drones just to take pictures, that is not prohibited. That is not prohibited in Michigan in statute or Michigan law. In fact, land use order 5.1 permits the use of drones with a permit and as long as it's not over specific areas. Fortunately, the statute being challenged here goes further and says, despite all that, you also can't use it at all to ever take game. So in this situation, if Mr. Funky were to hire, which he would want to do, Mr. Yoder to locate game to collect it, to locate downed game in order for him to collect it, that's prohibited. And it's that distinction that makes this a content-based statute. And in Sorrell versus IMS, when a statute distinguishes between the purpose of speech, then that is content-based and is subject to strict scrutiny. Now whether the state here satisfies strict scrutiny, that's not something that we have to prove at this stage, at the pleading stage. We would argue that they don't satisfy that given the numerous alternatives that would address the concerns of the state here in enacting this statute. And it's important to note also that really the entirety of First Amendment jurisprudence, or largely most of it, deals with statutes that don't explicitly prohibit speech, but affect it. And the Supreme Court has said, we've long recognized that even regulations aimed at proper government concerns can unduly restrict First Amendment rights. And that's precisely what is happening here. One final point and distinction, Your Honor, about the Zemel case that was raised by our friends on the other side. Zemel dealt with a general prohibition, a travel prohibition to Cuba. You were not allowed to travel to Cuba. The plaintiff there was making a First Amendment claim because their speech of documenting the history of Cuba or the culture of Cuba was burdened because they could not travel to Cuba. The distinction here is that this is not a general ban on drones, as we've seen that you can use drones to take pictures. It goes further. It's not just you can't use drones. You can't use drones specifically for the purpose of taking game, and taking is defined as the attempt, includes the attempt to locate and collect. And it has been in the discretion of DNR to apply that statute to our client-specific activity. So for those reasons, Your Honor, unless there are no other questions, we ask that this Court reverse the lower court. Thank you, Counsel. Thank you, both sides, for your arguments. Your case will be submitted.